## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| AAMIR COOPER, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 18-cv-1970 (TSC) |
| ) | |
| AMERICAN UNIVERSITY, ) | |
| ) | |
| Defendant. ) | |
| ) | |
| ) | |

### MEMORANDUM OPINION

Plaintiff Aamir Cooper sued American University ("AU"), alleging employment

discrimination based on his race and gender.  AU has moved for summary judgment

pursuant to Federal Rule of Civil Procedure 56, ECF No. 37.  For the reasons explained

below, Defendant's motion will be GRANTED.

### I. BACKGROUND

On January 4, 2016, Plaintiff, an African American man, began working as a

Police Dispatcher in AU's Police Department.  That same day, Plaintiff signed a form

acknowledging and agreeing to follow "the policies in the Staff Personnel Policies

Manual and other university polices."  Def.'s Stmt. of Undisputed Material Facts ¶¶ 14,

16 ("Def.'s Facts"), ECF No. 37-2.  The form included "specific instructions" on how

to access the Personnel Manual, *id.* ¶ 16, which "includes a reference to [AU's]

Discrimination and Sexual Harassment Policy," *id.* ¶ 3.  Plaintiff's job entailed

receiving emergency and non-emergency "requests for service by radio and telephone,"

determining an appropriate response to the caller "according to location and nature of

problem and procedures of the department," and "enter[ing], record[ing], track[ing] and updat[ing] service calls and police activity in the computer-aided dispatch system." *Id.* ¶ 15.

In late May 2017, a student lifeguard at the Reeves Aquatics Center complained to her supervisor, Anike Oladeji, that Plaintiff "had made inappropriate comments to her while at the swimming pool." *Id.* ¶ 17.  On May 26, 2017, Employee Relations Advisor Roberta Goldstein learned that Oladeji "had received several complaints from lifeguards and student pool patrons about Cooper."  Decl. of Deadre' Johnson ¶ 15, ECF No. 37-3.[1]  Goldstein "spoke to Will Sowers, the Assistant Director, University Police & Transportation Programs" and "asked that someone from the Department of Public Safety speak" to Plaintiff "and tell him not to use the pool until they had a chance to speak to [him] about the allegations."  *Id.* ¶ 16.  Shortly after, Captain Kevin Barrett called Plaintiff to his office, informed him "that there was an open investigation" and gave Plaintiff "a direct order not to go to the pool," Decl. of Kevin Barrett ¶ 7, ECF No. 37-5 at 11-12.  Although Plaintiff disputes the description of Barrett's statement as an order, Pl.'s Decl. ¶¶ 7-8, ECF No. 38-2 at 2-5, on June 28, 2017, Plaintiff was placed on administrative leave with pay for violating "instructions" not to visit the pool pending the outcome of the investigation of the "sexual harassment complaint" against him, ECF No. 38-2 at 86.

Meanwhile, on June 14, 2017, the student lifeguard spoke to Employee Relations Coordinator Jessica Finegan and "elaborated on her earlier May 2017 complaint to

---

[1]   Since 2013, Johnson, a Black woman, has held the position of Senior Director of Employee Relations and Recruiting in AU's Employee Relations Office, "interchangeably referred to as AU's Human Resources Department."  Her statements are "based on [her] personal knowledge."  Decl. ¶¶ 1-2, 4.

Oladeji about Cooper's conduct." Def.'s Facts ¶¶ 9, 20. Following her conversation with the lifeguard, Finegan spoke with HR Director Johnson and Employee Relations Advisor Santo A. Scrimenti, and an investigation ensued under Johnson's supervision. "[S]oon" after learning "about the student lifeguard's allegations," Johnson "emailed the Title IX Coordinator Regina Curran to inform her about the complaint and to schedule a call to discuss further." Johnson Decl. ¶ 20. Curran remained "informed throughout the course of the investigation."[2] Id. ¶ 21.

As part of the investigation, Finegan and Scrimenti interviewed Plaintiff, as well as the complainant, Oladeji, a male pool patron, and another female student lifeguard. Id. ¶ 23. They also received from Oladeji written statements from other female student lifeguards and pool patrons, which revealed that "a total of five female student lifeguards and pool patrons had complaints against" Plaintiff. Id. ¶¶ 25-26; see id. ¶¶ 28-34 (recounting complainants' statements that raised "more" concerns "about Cooper's inappropriate behavior," including one indicating that the behavior "had started as early as 2016").

On July 21, 2017, the investigation concluded with Scrimenti's and Finegan's "Confidential Report on Investigation." Id. ¶¶ 18, 35. The original complainant and Plaintiff were informed "simultaneously on July 28, 2017, about the outcome of the investigation," id. ¶ 44, which was also the date of Plaintiff's termination as per the

---

[2]   Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). "Sexual harassment of students can be a form of discrimination prohibited by Title IX[,]" and "the Office for Civil Rights has long recognized that sexual harassment of students engaged in by school employees, other students, or third parties is covered by Title IX." Off. for Civil Rights; Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties, 62 FR 12034-01.

recommendation of Human Resources.  In the termination letter prepared by Human

Resources in consultation with Police Chief Phillip Morse, Johnson Decl. ¶¶ 42-43,

Morse explained:

> HR's investigation  [  ]  included  interviews  with  you  and  the
> complainant as well as other staff and patrons of the Aquatic Center,
> and they were able to corroborate that you inappropriately attempted
> to make sexual advances toward at  least four students and one staff
> member. Four witnesses independently corroborated that you used
> the alias "Noah" and gave shifting stories about your affiliation with
> the University, never truthfully disclosing your role as University
> Police Dispatcher.
>
> The  University's  core  competencies  require  that  all  staff  act
> ethically and with integrity, which is defined, in relevant part, as
> "think[ing] carefully about the likely effect on others of one's
> words, actions and behavior." Additionally, the core competencies
> require staff to support a diverse and inclusive community, which
> means staff should avoid "doing or saying things that might offend
> others."
>
> You have exhibited a pattern of unprofessional and inappropriate
> behavior that runs counter to your duties as a member of the
> University Police Department and has substantially eroded and
> undermined  your  ability  to  do  your   job.  Specifically,  sexual
> advances  toward  those you are charged  to protect and assist in
> times of crises, as well use of a false identity, cannot be tolerated.
> Your behavior constitutes a Level III violation of University policy
> - serious misconduct - which is grounds for immediate termination.
>
> Therefore, consistent with the University's discipline policy, I have
> decided  to terminate your employment effective today, July 28,
> 2017.

ECF No. 37-4 at 98-99.

Johnson attests that she, Scrimenti, and Finegan "concluded that Cooper's

behavior was a Level III violation of AU policy and, as a result, [he] should be

terminated for cause."  Johnson Decl. ¶ 37.  Johnson "approved the termination decision

because Cooper's conduct was so egregious, given his role as a Police Dispatcher, and

because multiple witnesses provided similar statements describing a pattern of

inappropriate and aggressive behavior by Cooper." *Id.* ¶ 38.  Johnson notes:

> The recommendations section of the investigation report
> stated, *inter alia*: "Mr. Cooper did not admit to unprofessional
> behavior and inappropriate behavior when confronted with
> some of the allegations. Each of the remaining allegations,
> which Mr. Cooper denied, were verified and corroborated by
> at least two other lifeguards. Because every lifeguard
> interviewed and those who provided statements consistently
> described a pattern of inappropriate behavior, Mr. Cooper's
> assertions and explanations to the contrary are dubious. Mr.
> Cooper is an employee of the Department of Public Safety,
> making his unprofessionalism more egregious. Each lifeguard
> and pool patron interviewed had directly witnessed and
> experienced multiple instances of Mr. Cooper's inappropriate
> behavior."

Decl. ¶ 36 (citing Ex. 3).  Johnson further attests that Plaintiff's termination was not

based on his race or gender but "on the facts presented in the investigation," *id.* ¶ 40,

and that Plaintiff's "returning to the pool or using the pool in June 2017" did not factor

into the decision, *id.* ¶ 39.

Morse attests that he signed the termination letter because he

> believed the five student witnesses who accused Cooper of
> engaging in inappropriate conduct.  These student reports
> were disturbing to me, particularly since Cooper was a
> member of the University Police Department.  I have never
> had any member of the Police Department accused by this
> many students of such conduct as Cooper.

Decl. of Phillip Morse ¶ 7, ECF No. 37-5 at 2-5.[3]  He further attests that he

---

[3]    At all relevant times, Morse, a White man, was Chief of Police, Assistant Vice President of
AU's Police Services and Emergency Management. His statements "are based on [his] personal
knowledge." Decl. ¶¶ 1-2.

has "never treated Cooper differently in any manner due to his race or sex" and that the termination decision "was based on the facts presented in the investigation[.]"  *Id*. ¶ 8.

On June 19, 2019, the court dismissed Plaintiff's common law claims of defamation and intentional infliction of emotional distress, leaving only the Title VII discrimination claim for resolution.  *See* Mem. Op., ECF No. 17.

## II.  LEGAL STANDARD

Summary judgment is appropriate where there is no disputed genuine issue of material fact, and the movant is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  A dispute is "genuine" only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In determining whether a genuine issue of material fact exists, the court must view all facts in the light most favorable to the non-moving party.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The moving party bears the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits . . .' which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp.*, 477 U.S. at 323.  The non-moving party, in response, must "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"  *Id*. at 324.  To survive summary judgment the non-moving party must "produce evidence . . . capable of being converted into admissible evidence."  *Greer v.*

6

*Paulson*, 505 F.3d 1306, 1315 (D.C. Cir. 2007) (citing *Gleklen v. Democratic Cong. Campaign Comm.*, 199 F.3d 1365, 1369 (D.C. Cir. 2000 (other citation omitted)).  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249-50 (citations omitted).  "[A]t the summary judgment stage the judge's function is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id*. at 249.

### III.  ANALYSIS

Title VII's anti-discrimination provision makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a).  Title VII claims may be proved by direct or circumstantial evidence.

In the absence of direct evidence, as here, the court analyzes Title VII claims under the well-established burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See Barnette v. Chertoff*, 453 F.3d 513, 515 (D.C. Cir. 2006); *Lathram v. Snow*, 336 F.3d 1085, 1088 (D.C. Cir. 2003).  Under this framework, the plaintiff has the initial burden of proving a prima facie case of discrimination, which "is not onerous."[4] *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981).  While the plaintiff always carries the burden of persuasion, *id.* at 253, the burden of proof then "shifts to the defendant 'to articulate some legitimate,

---

[4]    The two essential elements of a Title VII claim are that (i) the plaintiff suffered an adverse employment action (ii) based on one or more statutorily protected categories.  *Baloch v. Kempthorne*, 550 F.3d 1191, 1196 (D.C. Cir. 2008).

nondiscriminatory reason for the [action in question],'" *Wiley v. Glassman*, 511 F.3d

151, 155 (D.C. Cir. 2007) (quoting *Texas Dep't of Cmty. Affairs*, 450 U.S. at 253).

Defendant has offered such reasons; therefore, the court need only decide on summary

judgment whether Plaintiff has "produced evidence sufficient for a reasonable jury to

find that the employer's asserted non-discriminatory reasons were not the actual reasons

and that the employer intentionally discriminated against the plaintiff on a prohibited

basis." *Adeyemi v. District of Columbia*, 525 F.3d 1222, 1226 (D.C .Cir. 2008) (citing

*Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 495 (D.C. Cir. 2008)); *see Wheeler*

*v. Georgetown Univ. Hosp.*, 812 F.3d 1109, 1114 (D.C. Cir. 2016) ("In reviewing a

summary judgment motion where the defendant has proffered some legitimate reason

for its adverse employment action . . ., [t]he only question that remains is whether the

evidence creates a material dispute on the ultimate issue.").  The court considers

"whether a reasonable jury could infer intentional discrimination . . . from all the

evidence, including (1) the plaintiff's prima facie case; (2) any evidence the plaintiff

presents to attack the employer's proffered explanation for its action; and (3) any

further evidence of discrimination that may be available to the plaintiff (such as

independent evidence of discriminatory statements or attitudes on the part of the

employer)." *Carter v. George Wash. Univ.*, 387 F.3d 872, 878 (D.C. Cir. 2004)

(citations and internal quotation marks omitted)).  "'The ultimate burden of persuading

the trier of fact that the defendant intentionally discriminated against the plaintiff

remains at all times with the plaintiff.'" *Wheeler*, 812 F.3d at 1114 (quoting *Texas*

*Dep't of Cmty. Affairs*, 450 U.S. at 253).

    "Title VII . . . does not authorize a federal court to become a super-personnel

department that reexamines an entity's business decisions," *Barbour v. Browner*, 181

F.3d 1342, 1346 (D.C. Cir. 1999) (citation and internal quotation marks omitted), and a court "may not 'second-guess an employer's personnel decision absent demonstrably discriminatory motive.'" *Fischbach v. District of Columbia Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996) (quoting *Milton v. Weinberger*, 696 F. 2d 94, 100 (D.C. Cir. 1982)).  Therefore, to establish that an employer's reason for the personnel decision was pretextual, a plaintiff must proffer evidence showing either "that a discriminatory reason more likely motivated the employer or . . . that the employer's proffered explanation is unworthy of credence." *Texas Dep't of Cmty. Affairs,* 450 U.S. at 256.  Pretext may be shown "in a number of ways, including by offering evidence of more favorable treatment of similarly situated persons who are not members of the protected class or that the employer is lying about the proffered justification." *Royall v. Nat'l Ass'n of Letter Carriers, AFL-CIO*, 548 F.3d 137, 144 (D.C. Cir. 2008).  But "[i]f the employer's stated belief about the underlying facts is reasonable in light of the evidence . . . there ordinarily is no basis for permitting a jury to conclude that the employer is lying about the underlying facts." *Id*. (alterations in original).

Plaintiff does not seriously dispute the legitimate, non-discriminatory reasons underlying his termination.  *See* Pl.'s Resp. to Def.'s Facts ("Pl.'s Resp."), ECF No. 38-4 (conceding numbered paragraphs 17-18, 20-23, 51-58, 69-70).  Instead, he "invokes comparator evidence in an effort to undercut [Defendant's] explanations" and to show that he was treated differently from similarly situated white employees.  *Burley v. Nat'l Passenger Rail Corp*., 801 F.3d 290, 301 (D.C. Cir. 2015).  Plaintiff also suggests improprieties with the investigation, which under certain circumstances "can also permit a factfinder to find pretext."  *Id*. at 296.

### 1. Comparator Evidence

To prove pretext, Plaintiff's evidence must show "that all of the relevant aspects of [his] employment situation were nearly identical to those of the comparators." *Neuren v. Adduci, Mastriani, Meeks & Schill*, 43 F.3d 1507, 1514 (D.C. Cir. 1995). "Factors that bear on whether someone is an appropriate comparator include the similarity of the plaintiff's and the putative comparator's jobs and job duties, whether they were disciplined by the same supervisor, and, in cases involving discipline, the similarity of their offenses." *Burley*, 801 F.3d at 301. "Whether two employees are similarly situated ordinarily presents a question of fact for the jury," but the court may find that employees are not similarly situated as a matter of law if a reasonable jury would be unable to reach that conclusion. *Duru v. D.C.*, 303 F. Supp. 3d 63, 73 (D.D.C. 2018) (quoting *George v. Leavitt*, 407 F.3d 405, 414–15 (D.C. Cir. 2005)).

Plaintiff compares his situation to that of two white women and one white man: (1) Lieutenant Rima Sifri, (2) Police Dispatcher Billie Cunningham, and (3) Academic Multimedia Services Coordinator Scott O'Beirne.  Johnson Decl. ¶ 46; Def.'s Facts ¶¶ 80-81; *see* Pl.'s Stmt. of Material Facts in Dispute ("Pl.'s Disp. Facts") ¶¶ 20-44, ECF No. 38-3.  None of these individuals are similarly situated to Plaintiff.

### Lieutenant Sifri

Sifri, a White woman, was the supervisor of Plaintiff's supervisor, Sergeant Darryl Queen, from February 2016 until April 2016 when Queen complained to Captain Sowers in writing that Sifri "had gossiped about him."  Morse Decl. ¶¶ 12-13, 16. Sowers "immediately investigated" the complaint; the "gossiping allegations were substantiated"; Morse and Sowers "removed" Sifri from her "new role of leading the

Communications Unit" but did not fire her; and Sifri "received a verbal warning." *Id*. ¶¶ 17-18.

As a Police Dispatcher, Plaintiff's position was "subordinate to Sifri's position as Police Lieutenant," and each "had different job responsibilities." *Id*. ¶ 14; *see* Darryl Queen's Decl. in Supp. of Pl.'s Opp'n to Summ. J. ¶ 4, ECF No. 38-2 at 7-8 ("the ranking within the department from highest to lowest goes like this: The Director or Chief of the Police Department, Captains, *Lieutenants*, Sergeants, Corporals, and *then patrol officers and Dispatchers*") (emphases added)).  Plaintiff has adduced no comparative evidence to the contrary and in fact admits that he and Sifri "had different roles."  Pl.'s Decl. ¶ 15.  He adds that they "shared certain job responsibilities in common," but has identified only the duty of "responding to calls to the AU police department," *id*., which admittedly is a duty that "[e]very active officer . . . shared," *id*. ¶ 16.

Even if Plaintiff's and Sifri's jobs were similar, their offenses were not.  Sifri was accused of and disciplined for gossiping about a co-worker, Def.'s Facts ¶ 109, whereas Plaintiff was accused of and terminated for a "documented pattern of inappropriate behavior" toward students that included "sexual advances." [5]  ECF No.

---

[5]  Plaintiff states that "Queen complained specifically of sexual harassment against Sifri," Pl.'s Resp. ¶¶ 109-110, but he has presented no corroborating evidence save Queen's supporting declaration prepared in November 2020.  The evidentiary record includes derogatory and crude remarks that Sifri allegedly made to other employees about Queen and about which Queen supposedly complained to Sowers verbally.  Queen Decl. ¶ 7.  But Queen's written complaint to Sowers dated April 1, 2016, Johnson Decl., Ex. 12, neither refers to nor implies sexual harassment.  Rather, Queen submitted a "formal complaint about unprofessional behavior I have been made aware" with respect to "rumors" about him, which, as discussed above, Defendant investigated.  Queen wrote that if Sifri is "in fact engaging in" such behavior, she would be "in violation of the directive . . . about gossiping in the workplace."  Queen requested (1) his removal "from [Sifri's] direct supervision" because "she is spreading lies about me around the department" and (2) that Sifri reveal her source of the rumors.  *Id*.  Nothing in the complaint suggests that Sifri made any

37-4 at 98-99.  Further, unlike Plaintiff's situation, Captain Sowers investigated Queen's complaint against Sifri without involving Human Resources, much less obtaining a recommendation of discipline.  *See* Johnson Decl. ¶ 53 ("I was not involved in [Queen's] complaint as it was handled by the Department of Public Safety[.]").  Consequently, the court concludes as a matter of law that no reasonable jury could find Sifri and Plaintiff to be similarly situated.

### Police Dispatcher Cunningham

Plaintiff suggests that in 2015, Cunningham, a White woman, was demoted from Sergeant to Police Dispatcher (rather than fired) for allegedly distributing and displaying pornographic images to other employees.  Plaintiff admits, however, that he has no direct knowledge of such occurrences.  *See* Def.'s Facts ¶¶ 117-129 (citing Pl.'s Depo.).  Plaintiff's witness, Darryl Queen, purports to testify about same but admits that the "incidents and the resulting demotion" of Cunningham "took place before [he] started working for AU."  Queen Decl. ¶ 14; *see id*. ¶ 1 (stating that he "speak[s]" from his "own experience as a [former] Sergeant in the police department, or . . . from other people with direct knowledge of the matter, who reported the information to me").  Because such hearsay is "[in]capable of being converted into admissible evidence," *Gleklen*, 199 F.3d at 1369, the foregoing statements "cannot be considered in . . . avoiding summary judgment," *Ragsdale v. Holder*, 668 F. Supp. 2d 7, 16 (D.D.C. 2009).

---

derogatory remarks directly to Queen or that Queen personally witnessed what Sifri is alleged to have said to other employees.  Therefore, Plaintiff's reliance on paragraph seven of Queen's declaration  is misplaced, particularly where in the next paragraph Queen states falsely that "Captain Sowers found Sifri engaged in sexual harassment."  Decl. ¶ 8.

Defendant's evidence establishes that unlike Plaintiff's situation, neither Human Resources nor Chief Morse received any complaints about Cunningham's purportedly similar behavior to trigger an investigation, Def.'s Facts ¶¶ 130-32 (citing Johnson Decl. ¶¶ 60-62), and although Plaintiff disputes those facts, he has not come forward with any evidence proving otherwise.  Surmising that "AU; either H.R. or the police department must have records," Pl.'s Resp. to ¶ 130, does not suffice to defeat a post-discovery summary judgment motion.  Further, Defendant has shown that on May 26, 2015, Cunningham was issued "a Level III final written warning" for the *dissimilar* conduct of failing to respond properly to a call and for interacting negatively with co-workers and supervisors.  Def.'s Facts ¶ 133 (citing Johnson Decl. ¶ 64 and Ex. 15).  Plaintiff acknowledges that a year later, in May 2016, Human Resources investigated Cunningham for complaints of "inappropriate verbal conduct" among co-workers and issued findings in her favor.  Pl.'s Disp. Facts ¶ 35 (citing ECF No. 37-3 at 77-81, Review Summary of "Allegations of Malicious Gossip").  And when asked during his deposition to name any other AU employee who "had five different people complain that they made inappropriate comments," was accused "of giving a false name to a student," and "of lingering around an area where a student worked in order to have further contact with the student," Plaintiff could not.  Def.'s Facts ¶¶ 71-74 (citing Depo. at 70, 71, 72, 73).  The court concludes that no reasonable jury could find from such evidence that Cunningham and Plaintiff were similarly situated.

### Librarian O'Beirne

Plaintiff claims that O'Beirne, a White man, was placed on administrative leave for attacking a Black female student during an anti-Trump rally, even though this was his third offense for violating AU's misconduct policy.  Def.'s Facts ¶¶ 138-40 (citing

Cooper Depo.).  Plaintiff admits that he lacks personal knowledge of the incident and when it occurred, having learned of it from a newspaper article and a YouTube video. *Id*. ¶¶ 143-47 (citing Cooper Depo. at 49, 51).  Nevertheless, it is undisputed that Beirne was employed as a librarian at the University's Library, not the Police Department; he and Plaintiff did not report to the same supervisor; and his job responsibilities had no connection to the Police Department.  *Id*. ¶¶ 136-37.  Further, Beirne's purported conduct toward one student, *id*. ¶ 140, was remarkably different from Plaintiff's harassing conduct toward multiple students.  And Beirne received a Final Written Warning for a Level II violation, ECF No. 37-3 at 83, whereas Plaintiff's violation was Level III.  Therefore, the court concludes as a matter of law that no reasonable jury could find any comparison, much less a similar one, between O'Beirne and Plaintiff.

### 2.  Defendant's Investigation

As indicated above, a "reasonable jury can conclude that an employer's reasons were pretextual and that discrimination was afoot if a plaintiff can show that an employer's 'investigation, which was central to and culminated in [the plaintiff's] termination, was not just flawed but inexplicably unfair.'"  *Burley*, 801 F.3d at 299 (quoting *Mastro v. Potomac Elec. Power Co.*, 447 F.3d 843, 855 (D.C. Cir. 2006)).  Thus, a plaintiff may survive a summary judgment motion by (1) showing that "the employer is making up or lying about the underlying facts that formed the predicate for the employment decision," (2) adducing "evidence that a factual determination underlying [the] adverse employment action is egregiously wrong, because 'if the employer made an error too obvious to be unintentional, perhaps it had an unlawful motive for doing so,'" *Burley*, 801 F.3d at 296 (quoting *Fischbach v. D.C. Dep't of*

*Corr.*, 86 F.3d 1180, 1183 (D.C. Cir.1996)), or (3) showing that the investigation was "so unsystematic and incomplete that a factfinder could conclude that the employer sought, not to discover the truth, but to cover up its own discrimination," *id*. (citing *Mastro*, 447 F.3d at 855.  That Plaintiff does not dispute the core facts and conclusions supporting the termination decision, *Cf.* Def.'s Facts ¶¶ 68-70 with Pl.'s Resp. to Facts ¶¶ 68-71 ("Undisputed; these [are] not material facts"), undermines this theory of the case.

Nevertheless, Plaintiff argues "possible pretext" based on Defendant's alleged failure to follow Title IX's investigative procedures.  Opp'n at 21-22.  This argument fails as a matter of law because where, as here, "a plaintiff alleges facts that are actionable under Title VII and for which Title VII provides a remedy, Title VII preempts virtually all other federal causes of action," *Kittner v. Gates*, 783 F. Supp. 2d 170, 174 (D.D.C. 2011) (citation omitted), including Title IX claims.  *See Morris v. Wallace Cmty. Coll.-Selma*, 125 F. Supp. 2d 1315, 1343 (S.D. Ala. 2001), *aff'd sub nom. Morris v. Wallace Cmty.*, 34 Fed. App'x 388 (11th Cir. 2002) (holding "in light of the weight of authority that a Title IX claim of employment discrimination may not be maintained to the extent that Title VII provides a parallel remedy") (surveying cases)).

Finally, Plaintiff argues that Defendant's failure to consult Queen as his direct supervisor "suggests that AU had a nefarious racial or gender-based motive."  Opp'n at 18.  But Queen states that Defendant followed "the usual course of conduct" where the "input" of immediate supervisors was not sought.  Queen Decl. ¶¶ 16-17, 27.  According to Queen, "H.R. would make [the] decision and investigative findings, and send the letter to the immediate supervisors to sign and hand-deliver to the employee." *Id*. ¶ 16.  Therefore, consistent with practice, Defendant did not seek Queen's input

with respect to Plaintiff or Billie Cunningham, whom he also supervised.  *Id*.  And while Queen opines that the disciplinary process should have been different, he affirms, based on his experience as a supervisor, that for "the purposes of discipline, it did not matter who your 'direct supervisor' was . . . it was all carried out and decided by Phillip Morse, and the H.R. department."  *Id*. ¶ 26.  Queen's statements corroborate Defendant's version that "Finegan's and Scrimenti's investigation did not differ in approach from any other investigation," and it was "in line with standard practice[.]" Johnson Decl. ¶ 41.  Therefore, the court concludes that no reasonable jury could infer pretext from the pre-termination investigation.

## IV.  CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment will be GRANTED.  A corresponding order will issue separately.


Date:  September 23, 2021

*Tanya S. Chutkan*
TANYA S. CHUTKAN
United States District Judge